UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:17-CV-565-KS

| | |
|---|---|
| MLU SERVICES, INC., | ) |
| Plaintiff, | ) |
| v. | )    **ORDER** |
| LAWRENCE MOBILE HOME SERVICE, INC., | ) |
| Defendant. | ) |

This matter is before the court on Defendant's motion for summary judgment [DE #134]. The matters raised have been fully briefed, and the motion is therefore ripe for decision. For the reasons set forth below, Defendant's motion is granted in part and denied in part.

## STATEMENT OF THE CASE

Plaintiff MLU Services, Inc., ("MLU") commenced this action against Defendant Lawrence Mobile Home Service, Inc., ("LMH") on November 9, 2017, based upon the court's diversity jurisdiction. MLU asserts claims under North Carolina law for breach of duty to negotiate in good faith and unfair or deceptive acts or practices, all in connection with a solicitation for bids by the Federal Emergency Management Agency ("FEMA") for disaster-recovery services in eastern North Carolina following Hurricane Matthew.

## STATEMENT OF THE FACTS

The undisputed facts relevant to the instant motion are summarized as follows:

MLU and LMH are both involved in disaster-recovery construction. (Def.'s Reply Stmt. Material Facts [DE #156] ¶ 1.) From 2005 to 2016, LMH worked as a subcontractor to MLU on four disaster-recovery projects involving "hauling and installing" mobile homes purchased by FEMA to house people displaced by hurricanes. (*Id.* ¶¶ 2–4.) In each of these instances, MLU managed and financed the work, while LMH performed skilled labor. (*Id.* ¶ 2.)

Following Hurricane Matthew in October 2016, FEMA solicited offers to haul and install temporary housing to serve displaced residents in eastern North Carolina. (Def.'s Reply Stmt. Material Facts ¶¶ 8, 10.) FEMA's solicitation, issued October 31, 2016, with a bid deadline of noon on November 1, 2016, was limited to businesses located in North Carolina. (*Id.* ¶¶ 10, 22.) LMH (headquartered in Goldsboro, North Carolina) was eligible to bid, but MLU (headquartered in Georgia) was not. (*Id.* ¶¶ 14, 15.)

Among other things, the solicitation required the prime contractor to "perform at least 15 percent of the cost of the contract, not including the cost of materials, with its own employees or employees of other businesses residing or primarily doing business in the set-aside area [of North Carolina]." (Def.'s Reply Stmt. Material Facts ¶ 11.) It also required the "use [of] local subcontractors to the maximum extent possible." (*Id.* ¶ 12.)

LMH had never previously contracted directly with FEMA (Def.'s Reply Stmt. Material Facts ¶ 17) and, upon receiving the solicitation, forwarded it to MLU (*id.*

¶ 2). After multiple telephone conversations, the specifics of which are disputed, LMH and MLU agreed that MLU would prepare a bid for the project with LMH as prime contractor. (*Id.* ¶¶ 21, 26.) LMH relied upon MLU's experience in bidding on FEMA projects, with MLU developing a competitive pricing proposal and submitting the bid to FEMA. (*See id.* ¶¶ 21, 23, 46, 85.) The bid described prior projects on which LMH had worked with MLU and stated that LMH "intends to perform this effort as the Prime Contractor and utilize [MLU] as its Prime Subcontractor." (*Id.* ¶¶ 40, 41.) The bid was made in LMH's name and signed by its President. (*Id.* ¶ 42.) However, the bid included MLU's phone number and email address; it did not include any contact information for LMH. (*Id.* ¶ 44.)

Due to the quick turn-around time, LMH and MLU did not execute a written agreement prior to the bid's submission. (*See* Def.'s Reply Stmt. Material Facts ¶¶ 26, 27.) Instead, they agreed to negotiate a final, written agreement after the bid was submitted. (*Id.* ¶ 26.) The parties verbally agreed that MLU would run the project like the parties' other haul and install projects. (*Id.* ¶¶ 19, 27.) MLU would be substituted as the prime contractor, assuming all responsibilities under the contract. (*Id.* ¶¶ 15, 19, 27; Dep. Billy Ulm [DE #65-1] at 63:11–24.) MLU "would manage the project" and "put up all the money, the management people, the yard and whatever else necessary to run the project. And [LMH] would set the homes, haul and install the homes." (Dep. Billy Ulm at 79:10–16.) However, the parties had not agreed on the amount LMH would be paid for hauling and installing the homes. (Def.'s Reply Stmt. Material Facts ¶ 28.) Prior to the bid submission, MLU suggested LMH be paid

$5,500 or $6,000 per unit for haul and install services; LMH wanted $7,500 per unit. (*Id.* ¶ 34.)

FEMA accepted the offer and, on November 4, 2016, emailed MLU the contract for execution by LMH. (Ex. L, Mot. Summ. J. [DE #141-2].) That same day, MLU presented LMH with a Teaming Agreement for the parties' submission of a FEMA proposal for the Hurricane Matthew project. (Ex. M, Mot. Summ. J. [DE #141-3].) MLU had never used a Teaming Agreement before. (Def.'s Reply Stmt. Material Facts ¶ 48.)

Under the proposed Teaming Agreement, LMH is identified as the prime contractor, responsible for preparation of the FEMA proposal, and agrees to "include [MLU] as one of its primary subcontractors in the Proposal." (Ex. M., Mot. Summ. J. ¶ 1.) It further provides as follows:

> In the event that a contract for performance of the Project is awarded to [LMH], [MLU] shall support and participate in contract negotiations as requested by [LMH].
>
> Further, the parties agree to negotiate, in good faith, toward the execution of a subcontract for the scope of services identified in Exhibit A to this Agreement, or for the scope as modified by agreement of the Parties or as required by the Client with the prices as set forth in Exhibit B. The terms and conditions of the subcontract will be generally consistent with the terms and conditions in the prime contract, [MLU's] form subcontract agreement and may be subject to approval by the Client. The pricing for the scope of services identified in the Exhibit A shall be those prices submitted in the Proposal unless modified by agreement of the Parties or as required by the Client.

(Ex. M., Mot. Summ. J. ¶ 2.)

Exhibit A to the proposed Teaming Agreement provides:

> The Parties anticipate that in the event that [LMH] is awarded a Contract for the Project . . . that [LMH] will negotiate a subcontract with [MLU] and that the scope of work will consist of assistance to [LMH] as further delineated in under the resultant subcontract between [MLU] and [LMH].
>
> The Parties agree that [LMH], [sic] minimum share of the contract task orders is based on applicable requirements by law and skills and experience of [LMH] and its employees. Both [LMH] and [MLU] will have responsibilities in the areas dealing with actual trailer haul and install efforts. This share may vary depending on the staff proposed and accepted, projects ultimately selected as part of the contract, client preference and licenses required to perform certain [contract line item numbers].
>
> Specific subcontractor task agreements will be written when the scope of work and contract requirements for the Housing Mission have been finalized with the Client. The actual amount of Housing Mission work may vary due to staff availability and the desirable mix of work effort accomplished by the individual firms in order to meet the Client's objectives and other firm participation.
>
> The Parties shall at all times strive to achieve the percentage work split identified previously with the understanding that this Work Share is not guaranteed and that certain legal requirements must be met regarding [LMH's] performance. At all times subject to requirements by law including but not limited to 52.226-5 RESTRICTIONS ON SUBCONTRACTING OUTSIDE DISASTER OR EMERGENCY AREA (NOV 2007).

(Ex. M., Mot. Summ. J. at 7.)

Exhibit B to the proposed Teaming Agreement contains pricing information for the subcontract between LMH and MLU. It provides that "[i]n consideration of [MLU] providing start-up funds for materials," LMH will receive certain specified amounts for work performed by LMH and that MLU's pricing will be the "per [unit] pricing submitted to Government and is applicable to all [contract line item numbers] for

5

work [MLU] or any subcontractor to [MLU] performs, with [MLU] to provide all labor and materials and item of work and expense." (Ex. M., Mot. Summ. J. at 8.)

Upon reviewing the proposed Teaming Agreement, LMH's President, Leroy Lawrence, refused to sign it. (Def.'s Reply Stmt. Material Facts ¶ 60.) He discussed the proposed Teaming Agreement with MLU's Vice-President, Billy Ulm, by telephone, but they were unable to reach a final agreement. (*Id.* ¶ 62.) Further discussions were conducted in person in Florida and in North Carolina (*id.* ¶¶ 63–64, 73–76), but the parties were unable to finalize any agreement (*id.* ¶¶ 72, 76).

## DISCUSSION

### I. Standard of Review

Summary judgment is appropriate when no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has met its burden, the non-moving party may not rest on the allegations or denials in its pleading, *Anderson*, 477 U.S. at 248, but "must come forward with 'specific facts showing that there is a genuine issue for trial,'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (emphasis omitted) (quoting former Fed. R. Civ. P. 56(e)).

Summary judgment is not a vehicle for the court to resolve disputed factual issues. *Faircloth v. United States*, 837 F. Supp. 123, 125 (E.D.N.C. 1993). Rather, the court's function "at the summary judgment stage . . . [is] to determine whether there

6

is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255. "Only disputes over facts that might affect the outcome of the suit . . . will properly preclude the entry of summary judgment." *Id.* at 248. Accordingly, the court must examine "both the materiality and the genuineness of the alleged fact issues" in ruling on Defendant's motion. *Faircloth*, 837 F. Supp. at 125 (emphasis omitted).

## II. Defendant's Motion for Summary Judgment

### A. Breach of Duty to Negotiate in Good Faith

LMH contends MLU's claim for breach of duty to negotiate in good faith fails as a matter of law because there was no valid, enforceable contract between the parties. As this matter is before the court on diversity jurisdiction, the court must apply the choice of law rules of the forum state, which the parties agree is North Carolina. *See Hitachi Credit Am. Corp. v. Signet Bank*, 166 F.3d 614, 623–24 (4th Cir. 1999); *Martinez v. Nat'l Union Fire Ins. Co.*, 911 F. Supp. 2d 331, 335 (E.D.N.C. 2012).

North Carolina's appellate courts have never recognized a claim for breach of duty to negotiate in good faith. However, the North Carolina Business Court addressed such a claim in *RREF BB Acquisitions, LLC v. MAS Props., LLC*, No. 13 CVS 193, 2015 WL 3646992 (N.C. Bus. Ct. June 9, 2015), *on reconsideration*, No. 13 CVS 193, 2015 WL 7910510 (N.C. Bus. Ct. Dec. 3, 2015). Recognizing that North Carolina law "already implies in every contract a duty of good faith and fair dealing," the *RREF* court reasoned that an agreement to continue negotiating in good faith could be enforceable, "provided that it met all of the requirements for contract

7

formation under North Carolina law." *RREF*, 2015 WL 3646992 at *20. *See also Burbach Broad. Co. of Delaware v. Elkins Radio Corp.*, 278 F.3d 401, 407–09 (4th Cir. 2002) (surmising that West Virginia would follow the modern trend in contract law and the "many state courts that have recognized the pragmatism and commercial necessity" of preliminary agreements "to negotiate . . . open issues in good faith in an attempt to reach the contractual objective within the agreed framework."). The North Carolina Business Court has since reaffirmed *RREF*, concluding that a claim for breach of an express agreement to negotiate in good faith exists under North Carolina law. *See New Friendship Used Clothing Collection, LLC v. Katz*, No. 16 CVS 14819, 2017 WL 3601714, at *15 (N.C. Bus. Ct. Aug. 18, 2017); *Recurrent Energy Dev. Holdings, LLC v. SunEnergy1, LLC*, No. 16 CVS 15107, 2017 WL 924922, at *16 (N.C. Bus. Ct. Mar. 7, 2017).

The concept of agreements to negotiate in good faith seems at odds with North Carolina Supreme Court precedent, including *Boyce v. McMahan*, 285 N.C. 730 (1974), which held that "a contract to enter into a future contract must specify all its material and essential terms, and leave none to be agreed upon as a result of future negotiations." *Boyce*, 285 N.C. at 734. Nevertheless, the court need not determine today whether a claim for breach of an agreement to negotiate in good faith is cognizable under North Carolina law. Even adopting the North Carolina Business Court's reasoning, MLU's claim here fails.

Under the North Carolina Business Court's reasoning, a claim for breach of an agreement to negotiate in good faith is dependent upon the existence of an express agreement that meets "all of the requirements for contract formation under North

8

Carolina law." *RREF*, 2015 WL 3646992 at *20. *See also Recurrent Energy Dev. Holdings,* , 2017 WL 924922, at *16. An agreement to agree remains unenforceable under North Carolina law as there is no meeting of the minds as to the essential terms of the agreement. *See Housing, Inc. v. Weaver*, 305 N.C. 428, 444 (1982) (discussing *Boyce*, 285 N.C. at 734); *Podrebarac v. Horack, Talley, Pharr & Lowndes, P.A.*, ___ N.C. App. ___, ___, 2021 WL 4534053, at *2 (Oct. 5, 2021); *Remi Holdings, LLC v. IX WR 3023 HSBC Way L.P.*, No. 15 CVS 20503, 2016 WL 7245900, at *3 (N.C. Bus. Ct. Dec. 12, 2016). According to the North Carolina Business Court, a duty to negotiate in good faith could arise where parties agree on some, but not all, of the material terms of a contract and expressly agree "to continue negotiating in [an] attempt to finalize the terms of the agreement." *RREF*, 2015 WL 3646992, at *20. In that circumstance, the parties are not bound by the substantive terms of the agreement, though they could be obligated to continue to negotiate in good faith in an attempt to finalize their agreement. *Id.*

The uncontroverted evidence in this case is that MLU and LMH agreed to work together on the project at issue but never executed a written agreement. Due to the time constraints imposed by FEMA, MLU and LMH verbally agreed to negotiate, after bid submission, a written agreement whereby MLU would run the project "like the parties' other missions" (Def.'s Reply Stmt. Material Facts ¶ 20) and LMH would haul and install the homes. The parties engaged in negotiations concerning the price to be paid LMH for its haul and install services, but the parties never reached an agreement as to price. Nor is there any evidence to suggest the parties reached an agreement concerning the scope of other work to be performed under the contract or

9

how the parties intended to effectuate MLU's management of the project when the project was awarded to LMH as the prime contractor, with MLU listed as an intended subcontractor. While the evidence establishes MLU and LMH agreed to work together with MLU providing funds and managing the project, there is no evidence of a meeting of the minds as to any material terms of their arrangement. Instead, the evidence shows the parties engaged in nonbinding discussions concerning the project in which they agreed upon a contractual objective with the expectation of finalizing a written agreement following further negotiations. The Teaming Agreement proposed by MLU and the parties' post-award negotiations contained pricing terms substantially different from those discussed prior to bid submission, further demonstrating the lack of mutual assent as to material terms.

The terms agreed upon by MLU and LMH are simply too vague and indefinite to provide the framework for a valid and enforceable agreement to negotiate in good faith. Accordingly, LMH is entitled to summary judgment as to MLU's claim for breach of the duty to negotiate in good faith.

### B. Unfair or Deceptive Acts or Practices

In counts two, three, and four of its complaint, MLU asserts claims under North Carolina's Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. § 75–1.1 *et seq*. "In order to establish a violation of . . . § 75–1.1, a plaintiff must show: (1) an unfair or deceptive act or practice, (2) in or affecting commerce, and (3) which proximately caused injury to [the] plaintiff[ ]." *Gray v. N.C. Ins. Underwriting Ass'n*, 352 N.C. 61, 68 (2000). An act or practice is unfair if it "offends established public policy," it is "immoral, unethical, oppressive, unscrupulous, or substantially injurious

10
Case 5:17-cv-00565-KS   Document 170   Filed 10/25/21   Page 10 of 13

to consumers," or it amounts to "an inequitable assertion of power or position." *Id.* "[A] practice is deceptive if it has the tendency to deceive." *Id.*

Contractual relations do not generally give rise to a § 75–1.1 claim. "The courts differentiate between contract and deceptive trade practice claims, and relegate claims regarding the existence of an agreement, the terms contained in an agreement, and the interpretation of an agreement to the arena of contract law." *Hageman v. Twin City Chrysler-Plymouth Inc.*, 681 F. Supp. 303, 307 (M.D.N.C. 1988). In these circumstances, there must be a showing of "substantial aggravating circumstances" to support a § 75–1.1 claim. *Broussard v. Meineke Disc. Muffler Shops, Inc.*, 155 F.3d 331, 347 (4th Cir. 1998).

1. Per Se Unfair Conduct (Count Two)

In count two, MLU alleges LMH engaged in unfair conduct by breaching the covenant of good faith and fair dealing implied in the parties' agreement to negotiate a final written contract. As set forth above, there was no enforceable contract between the parties. Thus, there is no implied covenant of good faith and fair dealing that could give rise to an unfair act or practice within the meaning of § 75-1.1. LMH is therefore entitled to summary judgment as to this claim.

2. Unfairness (Count Three) & Deception (Count Four)

In counts three and four, MLU alleges that LMH engaged in unfair and deceptive acts by cutting MLU out of all work on the project and keeping the proceeds for itself. The uncontroverted evidence in this case is that MLU and LMH verbally agreed to work together on the project, with MLU running the mission like the parties' other projects, but never reached an agreement as to the specific pricing or

scope of the agreement. While the parties agreed to negotiate a written agreement, there was no valid, enforceable contract. Nor is there evidence of any aggravating circumstance to support a § 75–1.1 claim. Rather, the evidence demonstrates that MLU was the more experienced and sophisticated party and submitted the FEMA bid with LMH listed as prime contractor and MLU listed as an intended subcontractor. While LMH did not agree with the terms later proposed by MLU, there is no evidence that LMH made intentional misrepresentations to induce MLU into submitting the FEMA bid. Instead, the evidence tends to show that MLU's proposed arrangement – substituting MLU as the prime contractor – was at odds with LMH's obligations under the FEMA contract. That LMH acted unfairly or with intent to deceive MLU cannot be reasonably inferred from the evidence. Accordingly, LMH is entitled to summary judgment on counts three and four.

### C. Quantum Meruit

Count five of MLU's complaint asserts a claim for quantum meruit. Under North Carolina law, "[q]uantum meruit is a measure of recovery for the reasonable value of services rendered in order to prevent unjust enrichment." *Paul L. Whitfield, P.A. v. Gilchrist*, 348 N.C. 39, 42 (1998). "It operates as an equitable remedy based upon a quasi contract or a contract implied in law." *Id.*

> [T]to establish a claim for unjust enrichment, a party must have conferred a benefit on the other party. The benefit must not have been conferred officiously, that is it must not be conferred by an interference in the affairs of the other party in a manner that is not justified in the circumstances. The benefit must not be gratuitous and it must be measurable. . . . [T]he defendant must have consciously accepted the benefit. . . .

*Booe v. Shadrick*, 322 N.C. 567, 570 (1988) (citations omitted). Where an express contract exists, the contract governs, and the law will not imply a contract. *Id.* However, quantum meruit may be available where, as here, parties fail to reach a binding agreement. *See id.*

The facts in this case are sufficient to withstand summary judgment on MLU's quantum meruit claim. The evidence in this case tends to show that MLU prepared the FEMA bid at LMU's request with the expectation it would be compensated for its efforts by means of a contract between the parties to work together on the project. Based upon this evidence, a reasonable inference can be made that LMH would be unjustly enriched were it allowed to accept the benefit of MLU's work without paying MLU for the reasonable value of its services in preparing and submitting the FEMA bid. Accordingly, LMH's motion for summary judgment is denied as to this claim.

## CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment [DE #134] is GRANTED as to counts one, two, three, and four of Plaintiff's Complaint and DENIED as to count five of Plaintiff's Complaint.

This 25th day of October 2021.

_____
KIMBERLY A. SWANK
United States Magistrate Judge